# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Alison M. Lorence                                    Civil No. 09-473 DWF/SRN

       **Plaintiff,**

    v.                                    **REPORT AND RECOMMENDATION**

**Michael J. Astrue, Commissioner**
**of Social Security,**

       **Defendant.**

_____

     Fay E. Fishman, Esq., Peterson & Fishman, 3009 Holmes Avenue South, Minneapolis, Minnesota 55408, on behalf of Plaintiff

     Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant
_____

SUSAN RICHARD NELSON, United States Magistrate Judge

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Alison Lorence seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") who denied Plaintiff's applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"). The parties have filed cross-motions for summary judgment, [Docket Nos. 13 and 16], and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be granted, the decision of the Commissioner be reversed, the case be remanded for an immediate award of benefits and Defendant's motion for summary judgment be denied.

I.     **BACKGROUND**

A.     **PROCEDURAL HISTORY**

Plaintiff Alison Lorence applied for SSI and DIB on December 2, 2003, alleging a disability onset date of October 15, 2002.  (Admin. R. at 106-08.)  Her date last insured is December 31, 2004.  (Id. at 98.)  Plaintiff alleges disability based on degenerative changes in her back, fibromyalgia, depression, chronic pain syndrome, sleep apnea with hypersomnolence, chronic fatigue syndrome and carpel tunnel syndrome.  Her applications were denied initially and upon reconsideration.  (Id. at 88-90, 93-95.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on October 5, 2006.  (Id. at 78-79, 87, 784-819.)  On February 15, 2007, the ALJ issued an unfavorable decision.  (Id. at 32-44.)  The Appeals Council vacated the hearing decision and remanded the case to the ALJ on July 31, 2007.  (Id. at 61-64.)

On remand, the Appeals Council instructed the ALJ to:  1) to reassess the physicians' opinions; 2) address Plaintiff's mental impairment; 3) further evaluate her subjective complaints; 4) give further consideration to her maximum residual functional capacity; and 5) if warranted, obtain supplemental evidence from a vocational expert. (Id. at 63.)  The Appeals Council also instructed the ALJ to consider Social Security Ruling 99-2p regarding chronic fatigue syndrome.  (Id. at 62.)

An ALJ held a hearing on the remanded issues on January 16, 2008.  (Id. at 820-44.)  On March 27, 2008, the ALJ issued an unfavorable decision.  (Id. at 12-26.) Plaintiff appealed to the Appeals Council which denied review.  (Id. at 7-9, 11, 780-83.)

The decision became the final decision of the Commissioner, and Plaintiff now seeks judicial review.

### B. FACTUAL HISTORY

Plaintiff was thirty-two years old on her date last insured, December 31, 2004. (Admin. R. at 106.) She obtained a Bachelor of Fine Arts degree in graphic design in 1995. (Id. at 156, 824.) Her first job was in a family owned tool and die shop when she was a teenager, but she also worked there during and after college at various times. (Id. at 138, 156.) From 1996 through 2002, Plaintiff worked varied hours as a freelance graphic artist. (Id. at 138.) In 1997, she also did some work as a promotional model. (Id.) Plaintiff quit working and moved in with her parents in 2002, because she was too ill to work or care for herself. (Id. at 152.)

Plaintiff testified at the hearing before the ALJ on January 16, 2008. (Id. at 823-38.) She testified that she had been unable to work since October 2002, because she suffers very significant pain and exhaustion, which began when she was fifteen. (Id. at 824.) She testified that her pain is all over, but her worst pain is in the head, neck and back, and it limits everything she does, including her cognitive functioning. (Id. at 824-25.) She testified that she quit exercising several years ago because it increases her pain. (Id. at 825.) Because all of her medications cause side effects, she testified that it was difficult to say which symptoms were caused by her illness and which were side effects of the medications. (Id. at 826.)

Plaintiff testified that she spends most of her day in bed or at doctor's appointments. (Id.) She watches television or reads magazines. (Id.) She used to have friends, but they do not visit her anymore. (Id.) She had been in an Internet support

group, but she quit going on the Internet over the past summer. (Id.) Plaintiff testified that she used to drive on occasion, but she has not done so since 2006 because she has been too sick and could not concentrate. (Admin. R. at 827.) She went to one movie in the year 2007. (Id.) On occasion, she sat in the car when her mother stopped to do an errand after taking her to an appointment. (Id. at 828.)

Plaintiff testified that her sleep has improved, but that she still sleeps ten to twelve hours at night, and sixteen hours once or twice a week. (Id.) She also naps two to four hours during the day. (Id. at 829-30.) Prior to the improvement in her sleep in December 2006, she would sleep sixteen to twenty hours a night, and when she had a really bad flare up of symptoms, she would sleep twenty hours a night for a week or two in a row. (Id. at 828-29.)

Plaintiff testified that she spends most of her time in bed because, when she gets up and walks around, she has the type of body pain one gets with the flu. (Id. at 830-31.) One or two days a week, she gets out of bed to walk for fifteen minutes or more. (Id. at 831.) In the month preceding her testimony, she got out of bed to eat on three or four occasions, otherwise, she ate in bed. (Id.) A couple of times a month, she helped her mother clean the kitchen or did some laundry. (Id. at 831-32.) Plaintiff testified she could only sit or stand comfortably for ten minutes, and could only lift a half gallon of milk. (Id. at 833-34.) Plaintiff also testified that on some days, her concentration is so poor that she cannot carry on a conversation. (Id. at 834.) Upon questioning by the ALJ, Plaintiff testified that she went to Florida for a week with her family three or four years ago. (Id. at 836.) Plaintiff testified that she spent her time sitting by the pool and went out to dinner twice. (Id. at 836.)

# C. MEDICAL EVIDENCE IN THE RECORD

## 1. Medical Records Before Plaintiff's Disability Onset Date

On April 13, 1998, Dr. Jessica Heiring, of the Minneapolis Clinic of Neurology, wrote a letter stating she had been treating Plaintiff since November, 1997 for chronic pain related to a motor vehicle accident that occurred in June 1997. (Admin. R. at 197.) She described Plaintiff's pain as diffuse neck pain, headaches, and extremity pain consistent with cervical and lumbar myofascial pain syndrome. (Id.) Dr. Heiring noted that despite treatment, Plaintiff felt she could not move on to a full-time job. (Id.)

To evaluate her headaches, neck and back pain, Plaintiff had MRIs of the brain and spine on May 3 and 4, 2000. (Id. at 244-51.) The MRIs of her brain, cervical and upper thoracic spine were normal. (Id. at 246, 247.) The MRI of her lumbar spine indicated a right paracentral disc herniation at L4-5, causing mild impingement on the right L5 nerve root and mild degenerative dessication at L3-4 associated with benign deformity of the superior L4 end plate. (Id. at 246.)

On November 19, 2001, Plaintiff saw Dr. Andrew Will at Physical Medicine and Rehabilitation. (Id. at 243.) Dr. Will noted he had previously seen Plaintiff at Sister Kenny Institute, but this was her first visit to his clinic. (Id.) Dr. Will noted that Plaintiff was living in New York City and working as a designer. (Id.) He stated that Plaintiff's fibromyalgia syndrome seemed to have improved during the year, but had recently worsened. (Id.) Plaintiff reported taking eight Ultram tablets a day, one or two Soma tablets, Nortriptyline and Clonazepam at bedtime, and Guafenesin. (Id.) Plaintiff reported that she found it very difficult to exercise, but she did go to a warm water pool. (Id.). On examination, Plaintiff was tender in multiple areas but her reflexes and strength

were normal.  (Admin. R. at 243.)  Dr. Will diagnosed fibromyalgia, and he prescribed Ultracet to replace Ultram, and Relaxin and Zanaflex in addition to her other medications.  (Id.)

Plaintiff next saw Dr. Will in May 2002.  (Id. at 241-42.)  Plaintiff was still working in New York but was visiting Minnesota for two weeks.  (Id. at 241.) Plaintiff reported feeling terribly for the last four months.  (Id.)  She was working only ten hours a week, and was bedridden with pain.  (Id.)  She reported that none of her medications were helping.  (Id.)  On examination, Dr. Will noted that Plaintiff appeared miserable, she was crying, her eyes were bloodshot, and she was tender over her entire body.  (Id.) Plaintiff had normal sensation, reflexes and strength.  (Id.)  Dr. Will diagnosed severe fibromyalgia.  (Id.)  He prescribed a trial of Percocet.  (Id.)  He recommended that Plaintiff see a rheumatologist to make sure she did not have any other problem.  (Id.)  He also advised Plaintiff to look into the drug Relaxin, which she had not yet done.  (Id.)  Dr. Will recommended that Plaintiff taper off her other medications, and suggested a Medrol Dosepak if the Percocet did not work.  (Id. at 242.)

Two days later, Plaintiff reported Percocet helped all but her low back pain, but she had side effects.  (Id. at 240.)  Dr. Will prescribed Oxycontin, Prevacid and Compazine.  (Id.)  He also prescribed Oxycodone for breakthrough pain.  (Id.)  Dr. Will ordered a lumbar MRI, which showed:

> L4-5 degenerative change in the disk with slight loss of disk space height and small central right-sided disk herniation slightly impressing on the thecal sac and causing mild central spinal canal stenosis.  There is a subtle compression of the superior end plate of L4 without evidence of increased T2 signal. . .

(Admin. R. at 239.)  Plaintiff reported feeling much better on Oxycontin, but she was still tender all over, worse at the forearms, which was aggravated by keyboard work.  (Id.)  Dr. Will continued Plaintiff's prescriptions for Oxycontin and Oxycodone, and prescribed Senoket.  (Id.)

Plaintiff saw Dr. Will again twice in June, and once in July 2002.  (Id. at 236-38.)  Plaintiff reported a flare up of pain in early June.  (Id. at 238.)  Dr. Will noted that Plaintiff appeared fatigued with a dark, sunken look in her eyes and prescribed physical therapy.  (Id.)  He recommended that she see other physicians because he had presented Plaintiff with every option he was aware of for fibromyalgia treatment.  (Id.)  On her next visit, Plaintiff reported she was going to move back to Minnesota, and she would start her physical therapy then.  (Id. at 237.)  Dr. Will noted Plaintiff was still tender at multiple areas and appeared fatigued.  (Id. at 237.)  He prescribed MS Contin and morphine instant release to replace Oxycodone.  (Id.)  Plaintiff reported that the morphine was helping, and she had also restarted Klonopin.  (Id. at 236.)

Plaintiff saw Dr. Marilyn Thompson at Sister Kenny Institute on August 7, 2002.  (Id. at 476-78.)  Dr. Thompson noted Plaintiff had chronic pain syndrome since an accident in July 1987, where she sustained fractures of the L1 through L4 vertebral bodies.  (Id. at 476.)  After her fractures healed, Plaintiff was treated at Sister Kenny Institute until she transferred her care to Dr. Will in April 2000.  (Id.)  Dr. Thompson noted Plaintiff was diagnosed with fibromyalgia in the early 90s.  (Id.)  She noted that Plaintiff's symptoms included nonrestorative sleep and hypersensitive skin to the touch and that Plaintiff had been through fibromyalgia clinics and other treatment programs.  (Id.)

Plaintiff reported her pain was a seven or eight on a scale of ten. (Admin. R. at 476.) She reported being happy with her pain relief on MS Contin, but she was very fatigued during the day, although she slept twelve hours at night, and napped. (Id.) Plaintiff reported having difficulty walking, standing and doing heavy lifting. (Id.)

On examination, Plaintiff had tightness in her range of motion, and in her muscles. (Id. at 477.) She was tender in all eighteen of the fibromyalgia points. (Id.) Her neurological examination was normal. (Id.) Dr. Thompson diagnosed chronic pain syndrome with fibromyalgia and significant myofascial tension in the neck and upper back. (Id.) Dr. Thompson recommended deep muscle physical therapy, a pool program, trigger point injections, and increased Nortriptyline. (Id.) Dr. Thompson also recommended an antidepressant, and a sleep study. (Id.) Plaintiff began physical therapy at the Courage Center in September 2002. (Id. at 310-414.)

Plaintiff next underwent a comprehensive polysomnography on September 4, 2002 at the Minnesota Sleep Institute. (Id. at 469-72.) The study indicated mild obstructive sleep apnea, and a multiple sleep latency test identified severe physiological sleepiness. (Id. at 469.) Dr. Joan Fox recommended that Plaintiff use a CPAP, and if there wasn't significant improvement, then a trial of a wake-promoting drug like Ritalin or Provigil. (Id.) Dr. Fox noted some of Plaintiff's drowsiness could be caused by her opiate use for chronic pain management. (Id.)

### 2. Medical Records from October 2002 through December 31, 2004

Plaintiff saw Dr. Samuel Yue at HealthEast Bethesda Pain Center for a consultation on October 22, 2002. (Id. at 269.) Dr. Yue reviewed Plaintiff symptoms, which included generalized body pain, headache, jaw pain, TMJ, dry eyes, dry mouth,

sinus difficulty, swallowing difficulty, sleep difficulty, stiffness in the morning, fatigue, memory problems, concentration problems, depression, anxiety, mood swings, acid reflux, indigestion, irritable bowel, aching, tingling and numb extremities and thoracic outlet syndrome. (Admin. R. at 269.) Plaintiff rated her pain a nine on a scale of one to ten, but Dr. Yue noted she was in no particular distress. (Id. at 269-70.) Dr. Yue diagnosed vasogenic thoracic outlet syndrome, and fibromyalgia with many symptoms. (Id. at 270.) He ordered an X-ray of Plaintiff's neck. (Id.)

Plaintiff's mother went to see Dr. Will on November 27, 2002, and reported that Plaintiff was too sick to see him and needed more morphine. (Id. at 232.) Dr. Will stated that Plaintiff had perhaps the most severe case of fibromyalgia he had ever seen. (Id.) He stated that fibromyalgia was no longer a large part of his practice, and Plaintiff should follow up at Sister Kenny, but he agreed to see Plaintiff until she established care there. (Id.) Plaintiff saw Dr. Will a few days later. (Id. at 229.) Plaintiff hoped for a higher dose of medication but was frustrated that Dr. Will did not recommend increasing her dose. (Id.) He noted that Plaintiff was tearful and tender all over, but she conversed with clear speech and exhibited good memory and thought processing. (Id.) Dr. Will prescribed Zoloft and Zanaflex. (Id. at 230) Dr. Will also recommended that Plaintiff see a psychiatrist and a psychologist. (Id.)

Plaintiff saw Dr. Yue on January 9, 2003, and reported having more pain since Dr. Will reduced her morphine. (Id. at 266.) Dr. Yue noted Plaintiff wanted to apply for Social Security Disability, but he warned her it would be very difficult to go back into the workforce after she applied. (Id.) Dr. Yue noted he would need to get to know her better before he could be certain she would not recover. (Admin. R. at 266.) Dr. Yue

recommended that Plaintiff discontinue morphine and begin methadone, and Plaintiff agreed. (Id.) In March, Dr. Yue recommended Botox injections for thoracic outlet syndrome. (Id. at 259.) He also increased Plaintiff's methadone. (Id.)

In June 2003, Plaintiff suffered episodes of abdominal pain, for which she saw Dr. David Weinberg at Minnesota Gastroenterology. (Id. at 280-82.) Dr. Weinberg described Plaintiff as healthy appearing. (Id. at 281.) Examination was normal, and the etiology of her abdominal pain was unclear. (Id.) Dr. Weinberg ordered additional testing for completeness sake, and stated Plaintiff should go to the emergency room for testing "with the next episode." (Id. at 282.) Plaintiff went to the emergency room with abdominal pain on September 1, 2003. (Id. at 298.) Plaintiff rated her pain as nine on a scale of one to ten. (Id.) Plaintiff was tender on examination, but was otherwise normal. (Id.) Lab tests were ordered, and Plaintiff was released after treatment with Droperidol. (Id.)

Plaintiff began treatment with Dr. Frank Rhame on September 5, 2003. (Id. at 275.) Plaintiff brought in a number of her lab results, but Dr. Rhame noted the results were normal. (Id.) Plaintiff reported her primary physician was Dr. Bateman at the Courage Center. (Id.) Dr. Rhame noted Plaintiff was slightly overweight, fragile, but healthy appearing. (Id.) Examination was normal. (Id.) Dr. Rhame assessed: 1) multiple complaints with little objective abnormality; 2) considerable psychological abnormality, "whether it is the cause of her symptoms or the result does not matter"; and 3) chronic fatigue syndrome. (Id.) Dr. Rhame recommended further assessment for chronic fatigue syndrome. (Id.) When Plaintiff returned for follow up, Dr. Rhame noted

Plaintiff's test results indicated that the correctable causes of chronic fatigue were normal. (Admin. R. at 274.)

In October, Plaintiff saw a physician assistant, Michelle Finke, at Minnesota Gastroenterology for complaints of abdominal pain and dysphagia, but Plaintiff reported the abdominal pain had resolved. (Id. at 276.) Plaintiff also reported intermittent headaches, fatigue, joint pain, and chronic pain throughout her body. (Id.) Ms. Finke recommended an esophagram with video swallowing study. (Id. at 277.) The test results were normal. (Id. at 296.)

Plaintiff had been participating in physical therapy at the Courage Center since her evaluation in September 2002. (Id. at 376-414.) She was discharged from physical therapy on December 10, 2003, after reaching a plateau in progress. (Id. at 376.) Physical therapist Colleen Peterson noted Plaintiff demonstrated decreased muscle tension and increased range of motion after sessions, but she experienced bouts where she could only tolerate bed rest.

Dr. Will provided a letter in support of Plaintiff's disability application to the Social Security Administration on January 9, 2004. (Id. at 113-14.) He described Plaintiff's long treatment history with him. (Id. at 113.) He noted that, although Plaintiff's pain was longstanding, it eventually became too severe for her to maintain employment. (Id.) Dr. Will opined:

> She always did look very fatigued and worn out by this pain. I always did feel she had one of the most extreme cases of fibromyalgia syndrome that I have ever seen. I certainly feel that she is not able to realistically perform any gainful employment.

(Admin. R. at 114.)

Dr. Ronald Bateman referred Plaintiff for myofascial manual therapy in August 2004. (Id. at 344-45, 348.) Plaintiff reported trigger point injections had helped somewhat, and her fatigue was slightly improved but still a burden causing her to sleep from ten to twenty-one hours a day. (Id. at 344.) On examination, Plaintiff's gait was slow and guarded, and her range of motion limited. (Id.) She had severe pain with palpation at numerous points. (Id.) The long-term goal of physical therapy was for Plaintiff to sit comfortably for sixty minutes without flare-up. (Id. at 345.)

On August 18, 2004, a state agency physician reviewed Plaintiff's medical records and opined that Plaintiff could occasionally lift twenty pounds, and frequently lift ten pounds; stand or walk for a total of six hours in an eight-hour workday, sit for six hours in an eight-hour period, with no further functional restrictions. (Id. at 415-422.) In support of this finding, the physician noted "multiple complaints w/ little objective abnormality." (Id. at 417.)

On September 4, 2004, Dr. Bateman noted Plaintiff was doing very poorly, sleeping most of the time for the previous three weeks. (Id. at 326.) He noted that Plaintiff was on Darvocet, Methadone, Zoloft, Klonopin, and Nortriptyline, and he would switch her Zoloft to Lexapro. (Id.) Several weeks later, Dr. Bateman noted Plaintiff had made no progress. (Id. at 325.) Dr. Bateman recommended that Plaintiff find a physician who specializes in chronic fatigue syndrome "since there has been no physiological reasons for her chronic fatigue to this time." (Id.)

### 3. Medical Records After Plaintiff's Date Last Insured

Plaintiff underwent a psychological consultative examination with Dr. Brian Powers in January 2005. (Admin. R. at 442-45.) Dr. Powers noted Plaintiff's grooming

and hygiene were fair and she appeared to be tired.  (Id. at 442.)  Plaintiff complained of stress, low energy, sleep problems, relationship problems, impaired memory, trouble concentrating, and situational depression.  (Id.)  She reported spending sixteen to twenty hours a day in bed.  (Id.)  Plaintiff was in a car accident at age fifteen, and two more accidents thereafter which exacerbated her problems.  (Id. at 443.)

Plaintiff reported that her interests were reading, writing on a computer, watching movies and television, but that she slept sixteen to twenty hours on a typical day.  (Id.) She bathed once a week with the aid of a shower chair.  (Id.)  Dr. Powers noted that Plaintiff appeared to have some difficulty focusing and concentrating.  (Id. at 444.) Plaintiff complained of stress and anxiety, but did not appear anxious.  (Id.)  Dr. Powers opined that Plaintiff's long-term memory may be slightly impaired.  (Id.)  He diagnosed major depression, recurrent and mild.  (Id.)  He assessed a GAF score of 58.  (Id.)  Dr. Powers opined that Plaintiff's difficulties were physical in nature, but she suffered depression as a result of grieving over her physical limitations.  (Id.)  He noted that her pain medications may adversely affect her ability to concentrate.  (Id.)

Dr. James Alsdurf, a state agency psychologist, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form for Plaintiff.  (Id. at 446-59.)  He opined that Plaintiff had an affective disorder that caused mild restrictions in activities of daily living, mild restrictions in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (Admin. R. at 456.)  Dr. Alsdurf also completed a Mental Residual Functional Capacity Form.  (Id. at 460-64.)  He opined that Plaintiff had the capacity to concentrate on, understand, and remember routine repetitive tasks, three and four step, uncomplicated instructions, but

would have moderate difficulties with detailed instructions and marked difficulty with complex instructions. (Id. at 464.) He opined that Plaintiff's persistence and pace would be adequate for routine repetitive tasks, and her ability to interact and get along with coworkers would be adequate for brief, infrequent, and superficial contact. Id. He also opined that Plaintiff's ability to follow an ordinary routine would be adequate to function with the ordinary level of supervision found in most customary work settings. Id. He further opined that Plaintiff's ability to handle stress would be adequate for the routine stressors of a routine, repetitive work setting. Id.

On March 7, 2005, Dr. Bateman wrote a letter stating that he began consulting with and treating Plaintiff for fibromyalgia and myofascial pain syndrome in May 2003, and, recently he had given her trigger point injections at the Courage Center. (Id. at 613.) Dr. Bateman reported that Plaintiff had undergone exhaustive studies with no significant pathological findings. (Id.) He further stated that Plaintiff had not made any functional progress in terms of activities of daily living "and certainly no work." (Id.) Dr. Bateman noted Plaintiff had declined psychiatric intervention but was on Wellbutrin. (Id.) Dr. Bateman referred Plaintiff to the Mayo Clinic. (Id. at 612.)

At the Mayo Clinic on March 8, 2005, Plaintiff was evaluated by Dr. Colin West in General Internal Medicine. (Id. at 497.) Plaintiff wanted to be tested to rule out other problems that might cause her symptoms. (Id.) Plaintiff's physical examination was normal except that she demonstrated positive trigger points throughout the musculoskeletal system. Strength testing was limited by her pain, and a Phalen's test was positive, consistent with carpal tunnel syndrome. Emotionally, Plaintiff was tearful during the evaluation, but otherwise healthy appearing. (Admin. R. at 498-99.)

Dr. West opined that Plaintiff "clearly has a chronic pain syndrome with a significant depression overlap." (Id. at 499.) He recommended a pain rehabilitation consultation, and that Plaintiff pursue psychiatric and psychological care to cope with her chronic illness. (Id.) Dr. West also recommended that Plaintiff use nighttime wrist splints for treatment of carpal tunnel syndrome. (Id.) He agreed that further diagnostic testing was reasonable. (Id.)

Plaintiff next saw Dr. Todd Nippoldt in Endocrinology at Mayo Clinic. (Id. at 495). On examination, Plaintiff appeared pale and tired, but otherwise was normal. (Id. at 495-96.) Dr. Nippoldt diagnosed adrenal suppression insufficiency from exogenous steroids. (Id. at 496.) He opined that this condition "could be contributing to at least some of her symptoms." (Id.) Dr. Nippoldt recommended physiological replacement with hydrocortisone. (Id.)

Plaintiff then underwent a neurological evaluation with Dr. Joseph Matsumoto at Mayo Clinic. (Id. at 491.) Examination was normal with the exception of a mild rapid tremor in the hands consistent with physiologic tremor. (Id.) The autonomic reflex screen was normal. (Id.) Dr. Matsumoto diagnosed fatigue and deconditioning, sleep disorder, cause uncertain, and chronic pain syndrome. Dr. Matsumoto ruled out multiple sclerosis, stroke or tumor. (Id. at 492.)

Plaintiff's next evaluation was with Dr. Barbara Bruce at Mayo Clinic's Pain Rehabilitation Center. (Admin. R. at 488.) Dr. Bruce interviewed Plaintiff at length. (Id.) Plaintiff reported chronic pain since she was fifteen, after she suffered compression fractures from a car accident. (Id.) Plaintiff reported being in physical therapy since she was fifteen. (Id.) Plaintiff described her pain as everywhere, and typically an eight on a

scale of one to ten. (Id.) Plaintiff reported she was able to finish high school but missed a lot due to pain. (Id.) Plaintiff also reported that she finished college, studying graphic design, but she feared she would never hold down a full-time job. (Id.) Plaintiff reported that she moved back in with her parents four years ago because of her pain, and she spends her day primarily in bed. (Id.) Plaintiff also reported having a boyfriend who visited her on weekends and other friends she saw on occasion. (Id. at 489.) Plaintiff reported that when she felt well and was very active for a few days, she then spent three weeks bedridden. (Id.) Plaintiff also reported that her treatments helped for short periods of time. (Id.) Dr. Bruce recommended participation in a chronic pain rehabilitation program. (Id.) Plaintiff wanted to wait and see if the treatment for adrenal insufficiency was effective first. (Id. at 489-90.)

Plaintiff saw Dr. West again in March. (Id. at 486.) Dr. West recommended that Plaintiff discontinue Clonazepam and replace it with Trazodone for sleep. (Id.) He also noted that Plaintiff met the criteria for depression and recommended psychiatric treatment. (Id.) The next month, Plaintiff reported that she felt better than she had in years from the treatment with hydrocortisone, but she had overdone things physically and was slipping back a bit. (Id. at 485). Dr. Nippoldt recommended that Plaintiff slowly taper from the hydrocortisone. (Id.) When Plaintiff returned in June, she reported being able to be active for two hours a day without aggravating her pain or becoming fatigued, although pain or fatigue occurred with more activity. (Admin. R. at 484.) Plaintiff was also making progress in physical therapy. (Id.)

Dr. Bateman referred Plaintiff to the Minnesota Head & Neck Pain Clinic in June 2005, for evaluation of her TMJ and jaw pain, bilateral neck pain, and headaches. (Id. at

516-18.) In addition to pain, Plaintiff reported sleeping twelve to sixteen hours per night and a daily nap. (Id. at 517.) Dr. Lois Kehl diagnosed myofascial pain contributing to headaches and right and left TMJ arthralgia. (Id.) Dr. Kehl recommended physical therapy, stress management and relaxation techniques. (Id.)

Plaintiff was seen by Dr. Mary Kwon at the Minnesota Head & Neck Pain Clinic on June 29, 2005. (Id. at 512.) Plaintiff reported having dull constant tension headaches and throbbing migraine headaches twice a week. (Id.) On examination, Plaintiff's posture was poor, she had occasional involuntary movement in her neck and hands, her neck range of motion was 80%, and she was severely tender. (Id.) Dr. Kwon diagnosed myofascial pain syndrome in the TMJ, cervical and thoracic spine, and mixed headaches. (Id. at 512-13.) Dr. Kwon gave Plaintiff trigger point injections and recommended physical therapy. (Id. at 513.)

Plaintiff's mother called Dr. Nippoldt at the Mayo Clinic on August 10, 2005. (Id. at 483.) She reported that Plaintiff could not get out of bed, even for doctor's appointments, due to extreme fatigue and feeling quite ill. (Id. at 483.) She also reported that Plaintiff's extremities were cold, but her trunk was hot and sweaty. (Id.) Dr. Nippoldt told Plaintiff's mother that Plaintiff's adrenal suppression had been reversed as long as two months prior to then and, therefore, was probably not the cause. (Id.) Dr. Nippoldt expressed concern that it was Plaintiff's medications that caused her fatigue, or an undiagnosed psychological issue. (Admin. R. at 483.) He recommended further evaluation for hypersomnolence. (Id.)

On August 29, 2005, Plaintiff returned to the Minnesota Sleep Institute where she last had a sleep study in 2002. (Id. at 465.) Plaintiff reported that, after some

improvement following her treatment at the Mayo Clinic, her pain, sleep disruption, and fatigue during the day abruptly got worse.  (Id.)  Plaintiff also reported she was not using her CPAP because she could not tolerate the mask.  (Id.)  Dr. Fox recommended a repeat sleep study.  (Id. at 466.)

Plaintiff saw Dr. Nippoldt again in December 2005.  (Id. at 552.)  She reported that her achiness and fatigue continued, and she spent most of her time in bed.  (Id.)  Dr. Nippoldt did not believe adrenal insufficiency was causing her symptoms, and he advised Plaintiff to taper off hydrocortisone.  (Id.)  He felt it could be Plaintiff's chronic pain syndrome and medications that were keeping her in bed.  (Id.)

In February 2006, Dr. Ronald Bateman completed a Fibromyalgia Residual Functional Capacity Questionnaire on Plaintiff's behalf.  (Id. at 526-31.)  He noted that he had treated Plaintiff approximately every three months since May of 2003.  (Id. at 526.)  He noted Plaintiff's diagnoses were fibromyalgia, depression, chronic fatigue and myofascial pain syndrome and her prognosis was poor.  (Id.)  He noted that the clinical findings that supported Plaintiff's diagnoses were significant, including nine trigger points of fibromyalgia, muscle tenderness, tightness and spasms, depression, low endurance and fatigue.  (Id.)  Dr. Bateman indicated that Plaintiff was not a malingerer.  (Id. at 527.)  He also indicated that emotional factors contributed to the severity of Plaintiff's symptoms.  (Admin. R. at 527.)  Dr. Bateman described Plaintiff's pain as daily, consistent, and frequently severe enough to interfere with her attention and concentration.  (Id.)  Dr. Bateman noted Plaintiff could not even leave her home for doctor's appointments at times, and she could not tolerate a work environment.  (Id.)  He

opined that Plaintiff could sit for twenty minutes out of two hours, and stand for fifteen minutes out of two hours.  (Id. at 529.)

Plaintiff returned to see Dr. Nippoldt in June 2006.  (Id. at 549.)  She reported that she was deteriorating with continued pain, hypersomnolence, hair loss, abdominal pain, flank pain, and light-headedness.  (Id.)  Dr. Nippoldt opined that adrenal suppression was still likely the diagnosis.  (Id. at 550.)  He ordered a CT scan and other tests to evaluate Plaintiff's abdominal pain.  (Id.)  Dr. Nippoldt also opined that Plaintiff should have intensive evaluation and management with psychiatry, and he recommended participation in the pain rehabilitation program.  (Id.)  Plaintiff's tests came back normal.  (Id. at 548.)

Plaintiff's mother called the Mayo Clinic in July and spoke to RN Linda Peterson. (Id. at 547.)  She reported that Plaintiff had not benefitted from other pain programs, and was physically unable to attend another program.  (Id. at 547.)  Plaintiff's mother was concerned that something was missed in Plaintiff's diagnoses.  (Id.)  Nurse Peterson promised to consult with Dr. West to see if he had any recommendations.  (Id.)

Plaintiff was hospitalized at Abbot Northwestern Hospital on July 11, 2006, for evaluation of abdominal pain.  (Id. at 535-41, 559-577.)  She was examined by Dr. Lawrence Mulmed the next day.  (Id. at 539.)  Dr. Mulmed noted that her examination was essentially normal, and CT scans and an EGD were unremarkable.  (Id. at 539-40.) Dr. Mulmed wanted to review Plaintiff's records from Mayo Clinic and then follow up. (Admin. R. at 539-40.)

Plaintiff underwent a psychological evaluation with Social Worker Nancy Gamaas at the Courage Center on September 25, 2006.  (Id. at 578-80.)  Plaintiff reported that her activities were watching television, reading, and visiting friends when able.  (Id.

at 578.) Plaintiff reported being devastated at the suggestion that her problems were emotional in nature. (Id.) On mental status examination, Plaintiff appeared sad and tired, but otherwise intact. (Id. at 579.) Ms. Gamaas assessed Plaintiff with a GAF score of 30, noting a severe problem related to her social environment in that she could only leave home twice a month, was forced to live with her parents, and could not take care of herself. (Id.) She recommended a psychiatric consultation and individual psychotherapy. (Id. at 580.) Plaintiff did not return for psychotherapy. (Id. at 774.)

On September 27, 2006, Plaintiff met with Dr. Joan Fox to review the results of her comprehensive polysomnography. (Id. at 583, 595-96.) Dr. Fox opined:

> [Plaintiff's] sleep disordered breathing, both obstructive and central, may in part be related to her Methadone use. Her severely fragmented sleep is potentially a consequence of chronic pain, though overall, this is not well understood. She clearly is excessively sleepy during the day despite having spent 10 hours of sleep in bed. Her lack of slow-wave sleep and REM sleep are affecting her chronic pain and memory and cognition. . . . I think she should be given an opportunity to try Xyrem given her physiological sleepiness and severely fragmented sleep.

(Id. at 584.) Dr. Fox also referred Plaintiff to a cardiologist for evaluation of her resting tachycardia. (Id.) The cardiologist diagnosed asymptomatic baseline sinus tachycardia, and prescribed Atenolol. (Id. at 699.) Dr. Fox wrote a letter dated September 27, 2006, stating that Plaintiff's poor sleep quality, documented by sleep studies, affected her overall health and aggravated her pain. (Admin. R. at 582.) She opined that Plaintiff's sleepiness affects her memory, focus, concentration, and attention. (Id.) Dr. Fox opined that Plaintiff was completely disabled. (Id.)

On November 7, 2006, Plaintiff underwent a psychiatric evaluation with Dr. Scott Crow at the Courage Center. (Id. at 776-77.) Plaintiff reported frustration with her

medical care, and that the extent of her pain was underestimated.  (Id. at 776.)  Plaintiff also reported a depressed mood, diminished enjoyment, trouble focusing and concentrating, but she denied suffering from anxiety or panic.  (Id.)  Dr. Crow diagnosed a mood disorder due to her medical problems.  (Id. at 777.)  He noted that Plaintiff's dosage of Nortriptyline was probably too low to treat depression.  (Id.)

On November 30, 2006, Plaintiff saw Dr. Karen Vrchota at Integrative Health Care of Winona for evaluation and treatment for chronic fatigue syndrome.  (Id. at 642-45.)  Plaintiff reported skin pain so severe that she could only shower once or twice a week, and could not wash her face or brush her teeth daily.  (Id. at 643.)  Plaintiff reported being bedridden all but a few hours on her good days.  (Id.)  Plaintiff stated that on a scale of one to ten, her energy and sleep were a two, mental clarity a six, and achiness and overall well being was three.  (Id.)  Dr. Vrchota reviewed Plaintiff's many symptoms, and noted Plaintiff was "3 for psychological and 11 for physical symptoms" on the Beck Inventory.  (Id. at 644.)

On examination, Dr. Vrchota noted Plaintiff appeared exhausted and could barely make it through the interview.  (Id.)  Dr. Vrchota concluded that Plaintiff met the CDC criteria for chronic fatigue syndrome.  (Id. at 645.)  Plaintiff was asked to follow up in six weeks.  (Id.)

Plaintiff saw Dr. Fox on December 20, 2006, and reported that the first few nights after she took Xyrem for sleep her pain was cut in half.  (Admin. R. at 724.)  A week later, Plaintiff saw Dr. Marc Salita.  (Id. at 767.)  Plaintiff reported that her pain was worse, and she was less functional since her Methadone was decreased earlier that month.  (Id.)  Plaintiff's examination was normal.  (Id. at 769.)

Plaintiff followed up with Dr. Crow for psychiatric medication management in January 2007. (Id. at 775.) Plaintiff agreed to try Cymbalta. (Id.) In February, Plaintiff reported improvement in her mood. (Id. at 773.)

Plaintiff went to an emergency room on March 8, 2007, with complaints of feeling cold and sweaty, a fast heart rate, dizziness and lightheadedness, diffuse tingling and muscle aches, blurred vision, cold symptoms, and crampiness. (Id. at 708-18.) Examination was normal with the exception of sinus tachycardia. (Id. at 709-10.) Plaintiff was admitted to the hospital and was discharged two days later with a diagnosis of viral illness or exacerbation of chronic pain syndrome. (Id. at 711-13.) Plaintiff saw Dr. Fox a few days later and reported that, although she was sleeping better, she felt worse. (Id. at 723.) Dr. Fox noted that Plaintiff's clinical history and laboratory markers were very compatible with chronic fatigue syndrome; therefore, she would defer evaluation and management to Dr. Vrchota, who had expertise in chronic fatigue syndrome. (Id.) Two days later, Plaintiff saw Dr. Salita for complaints of tremors and nausea. (Id. at 763.) Examination was normal, and Dr. Salita recommended follow up. (Id. at 764-65.)

In June 2007, Plaintiff saw Dr. Jeffrey Ruegemer at the Endocrinology Clinic of Minneapolis, on referral from Dr. Salita. (Id. at 731.) Plaintiff reported that Dr. Nippoldt diagnosed adrenal insufficiency and treated her with hydrocortisone. (Admin. R. at 731.) Plaintiff reported that she was told on various occasions that her acute abdominal pain could be an adrenal crisis. (Id.) Plaintiff was tearful and shaky on examination. (Id. at 732.) Dr. Ruegemer ordered a metabolic panel. (Id.)

Plaintiff went to an emergency room on July 18, 2007, with concern about her oxygen saturation because her fingernails were blue. (Id. at 703.) Plaintiff was reassured by the triage nurse that her oxygen saturation was fine. (Id.) Plaintiff also complained of intermittent light-headedness and abdominal symptoms. (Id.) Plaintiff appeared anxious, but examination was otherwise normal. (Id. at 705-06.)

Plaintiff saw Dr. Fox on August 1, 2007. (Id. at 719.) Plaintiff reported difficulty initiating and maintaining sleep, weight loss, fatigue, and the inability to get out of bed or eat. (Id.) Plaintiff felt she slept better on Xyrem, but reported that she still slept twelve hours at night and did not feel rested. (Id.) Dr. Fox noted that Plaintiff was discouraged and was having significant physical symptoms. (Id.)

A week later, Plaintiff saw Dr. Salita and reported that she had lost 45 pounds on a glutein and casein free diet. (Id. at 754.) Plaintiff had resumed her Methadone and said she felt better for the first time in two months. (Id.) Dr. Salita made a referral to a nutritionist, whom Plaintiff saw on September 21, 2007. (Id. at 745, 756.) Plaintiff also saw Dr. Dina Gad, and reported being upset at her endocrinologist, whom she felt was not being straight with her regarding her diagnosis. (Id. at 756-57.) Dr. Gad noted Plaintiff was restless and tearful, with pressured speech and paranoid ideation. (Id. at 759.) Dr. Gad recommended that Plaintiff increase her hydrocortisone for adrenal insufficiency. (Admin. R. at 759.)

Plaintiff saw Dr. Ruegemer on August 24 with complaints of decreased appetite, nausea, tremors, cold intolerance, and tingling in her upper back. (Id. at 727.) Dr. Ruegemer diagnosed probable adrenal insufficiency and recommended steroids. (Id.)

On September 7, 2007, Plaintiff saw Dr. Salita and reported visual hallucinations.

(Id. at 751.)  Dr. Salita prescribed Seroquel to treat her hallucinations .  (Id. at 753.)

Plaintiff saw Dr. Salita a month later and reported she saw Dr. Vrchota a week earlier,

who noted some improvement.  (Id. 748.)  Plaintiff was taking vitamins and was on a diet

after seeing a dietician.  (Id.)  Plaintiff was started on Neurontin.  (Id. at 750.)

On September 27, 2007, Dr. Vrchota completed a Fibromyalgia Residual

Functional Capacity Questionnaire on Plaintiff's behalf.  (Id. at 620-25.)  Dr. Vrchota

noted that she saw Plaintiff every six to twelve weeks since November 2006.  (Id. at

620.)  Dr. Vrchota reported that Plaintiff's diagnoses were chronic fatigue syndrome,

adrenal insufficiency and chronic pain syndrome.  (Id.)  She noted that Plaintiff did not

meet the criteria for fibromyalgia, with only two of eighteen tender points.  (Id.)  Dr.

Vrchota listed a number of clinical and laboratory test results that were consistent with

Plaintiff's diagnoses including blood pressure, heart rate, cold hands and feet, muscle

weakness and decreased grip strength, and others.  (Id.)  Dr. Vrchota opined that Plaintiff

was not a malingerer, and she did not know whether emotional factors contributed to the

severity of Plaintiff's symptoms.  (Admin. R. at 621.)

Dr. Vrchota opined that Plaintiff's pain was severe enough to interfere with her

attention and concentration constantly, and Plaintiff was incapable of even low stress

work because stress depletes adrenal reserves and triggers an adrenal crisis.  (Id. at 622.)

She opined that Plaintiff's medications of Methadone and Clonazepam could cause

drowsiness and slow reaction time.  (Id.)  Functionally, Dr. Vrchota opined that Plaintiff

could walk less than one block, could sit forty-five minutes, and stand five minutes.  (Id.

at 623.)  Dr. Vrchota opined that Plaintiff could not work an eight-hour day because she

needs to lie down frequently.  (Id.)  On a mental capacities assessment form, Dr. Vrchota

opined that Plaintiff's chronic fatigue syndrome caused chronic exhaustion, exertional fatigue, cognitive dysfunction and decreased attention and concentration, which would severely limit any employment. (Id. at 627.)

### D. EVIDENCE FROM THE VOCATIONAL EXPERT

A vocational expert ("VE"), Steven Bosch, testified at the January 16, 2008 administrative hearing. (Id. at 837-43.) The ALJ asked Bosch to assume an individual who was twenty-nine years old on the onset date, who had a college education, "work experience is only by herself," who is on a number of medications with reported side effects of sleep issues and dry mouth, who is impaired by fibromyalgia, chronic fatigue syndrome, sleep disorder, osteoarthritis and who suffers chronic pain and headaches, who is limited to lifting ten pounds occasionally, five pounds frequently, work with only low to moderate standards for persistence or pace, only incidental public contact and brief and superficial contact with all others, limited to unskilled work with no heights, ladders, scaffolding, dangerous or hazardous equipment or machinery or vibrating equipment, no over-shoulder work, and the ability to change position at least hourly. (Admin. R. at 839.) The ALJ asked Bosch whether such a person could do any of Plaintiff's previous work, and Bosch responded in the negative. (Id.) The ALJ then asked whether there was any other work such a person could do in the regional or national economy. (Id.) Bosch responded that such a person could be a security monitor, and could perform some sedentary production work including optical assembly, semi-conductor bonder, and electronic assembly. (Id. at 839-40.)

The ALJ posed a second hypothetical question with a similar individual at a sedentary level, who in addition to the previous restrictions, would frequently experience

pain and symptoms that would interfere with attention and concentration; would be incapable of a low stress job; could have no exposure to temperature or humidity extremes; could sit a maximum of two out of eight hours, for only twenty minutes at a time; could stand only two out of eight hours, for only fifteen minutes at a time; would take unscheduled breaks of an undeterminable number during the day; would have limitations in repetitive reaching, handling and fingering, such that none could be done more than twenty percent of the day; could never crouch, and could only stoop ten percent of the day. (Id. at 840.) Bosch testified that with those limitations, work would not be possible. (Id.)

Plaintiff's attorney then posed an additional hypothetical question, adding the limitations that the person would be moderately limited in the ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination or proximity to others without being distracted by them, complete a normal day or workweek without psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Admin. R. at 841.) Bosch testified "[i]n combination those moderate limitations would not allow for competitive employment." (Id.) Bosch also viewed Exhibits 27F and 28F[1] and testified that such a person as portrayed in those documents could not perform full-time work. Id. at 841-43.

---

[1]     Exhibits 27F and 28F are questionnaires completed by Dr. Vrchota. (Admin. R. at 620-28.)

### E.       THE ALJ'S DECISION

On March 27, 2008, ALJ Diane-Townsend Anderson concluded Plaintiff was not disabled within the meaning of the Social Security Act from October 15, 2002 through the date-last-insured of December 31, 2004.  (<u>Id.</u> at 12-26.)  The ALJ applied the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a) for determining disability.  (<u>Id.</u> at 16). At step one, under 20 C.F.R. § 404.1520(b), the ALJ found that Plaintiff did not engage in substantial gainful activity on or after October 15, 2002.  (<u>Id.</u> at 17.)  At step two, under 20 C.F.R. § 404.1520©, the ALJ found that Plaintiff had severe impairments of fibromyalgia, chronic fatigue syndrome, sleep disorder, osteoarthritis, chronic pain and depression.  (<u>Id.</u> at 17.)  The ALJ did not include adrenal insufficiency as one of Plaintiff's impairments because it was diagnosed after Plaintiff's date last insured.  (<u>Id.</u> at 18.)

At the third step of the evaluation process under 20 C.F.R. § 404.1520(d), the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Admin. R. at 18.)  The ALJ found that Plaintiff's depression did not meet or medically equal listing 12.04 because she did not satisfy the "Paragraph B" criteria of a mental impairment resulting in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  (<u>Id.</u> at 18.)

The ALJ reasoned that Plaintiff's activities of daily living were moderately restricted because she lives with her parents, and spends much of her day in bed watching

television, reading and using her laptop computer.  (Id.)  The ALJ reasoned that Plaintiff's social functioning was moderately impaired because Plaintiff got along well with her family, but her social functioning was limited due to the amount of time spent in bed. The ALJ noted that Plaintiff could communicate effectively.  (Id.)   The ALJ further reasoned that Plaintiff had moderate difficulties with concentration, persistence or pace, perhaps due to chronic narcotic use, but that Plaintiff remained "highly focused on her health and health history."  The ALJ noted that Plaintiff remained oriented with only slight impairment of long-term memory at a psychological examination in 2005.  (Id. at 19.)  The ALJ did not find any episodes of decompensation.  (Id.)  The ALJ also noted that Plaintiff did not have a history of mental health treatment.  (Id. at 18.)  The ALJ noted that Plaintiff was not diagnosed with major depression until 2005, at which time her GAF score was 58.  (Id. at 19.)

The ALJ also found no evidence of the "C criteria" under Listing 12.04.  (Id.) The ALJ noted that she translated the "B" and "C" criteria findings into work-related functions in her residual functional capacity assessment ("RFC").  (Id.)

At step four of the disability evaluation under 20 C.F.R. § 404.1529, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567, and "avoiding work at heights and climbing of ladders and scaffolds, overhead reaching, and work near dangerous equipment and hazards and vibratory equipment, and further limited to only incidental contacts with the public, brief and superficial contacts with coworkers and supervisors, and no more than low-to-moderate standards for persistence and pace."  (Admin. R. at 19.)

With respect to Plaintiff's subjective complaints, the ALJ noted that Plaintiff testified that she is unable to work because of fibromyalgia and chronic fatigue, and that her health negatively impacted both her physical and mental functioning with chronic pain, and waxing and waning deficits of concentration and fatigue. (Id. at 20.) The ALJ concluded that Plaintiff's medically determinable impairments could be reasonably expected to cause her symptoms, but her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible. (Id.) She further concluded that Plaintiff's disabling pain and incapacitating limitations were not "consistent with or supported by the objective medical record of treating or examining physicians." (Id.)

The ALJ reviewed Plaintiff's medical records dated from 1997 through September 2004. (Id. at 20-24.) In assessing the medical opinions, the ALJ noted that Plaintiff pursued an extensive medical work up but generally had normal neurologic findings and laboratory studies. (Id. at 24.) The ALJ also noted that many providers suggested emotional symptoms were exacerbating Plaintiff's pain, but Plaintiff "denied any true depression" and did not seek formal treatment. (Id.)

The ALJ also noted that, although Plaintiff complained of hypersomnolence, she had complained of such since high school but was subsequently able to work in her chosen field. (Admin. R. at 24.) After a sleep study, the ALJ noted that it was recommended that Plaintiff use a CPAP, but Plaintiff voluntarily discontinued using it. (Id.) Further, after Dr. Rhame tested Plaintiff for "the correctable" causes of chronic fatigue, the ALJ noted that the results were normal. (Id.) The ALJ further noted that Dr. Bateman found no physiological reason to explain Plaintiff's chronic fatigue. (Id.) The ALJ reasoned that Plaintiff's failure to seek a further sleep evaluation until 2005 suggests

she had no significant problem with sleep in the interim.  (Id.)  Thus, the ALJ concluded

that she did not place controlling weight on Dr. Heiring's 1998 and 1999 opinions

because they were not well supported by objective findings.  The ALJ stated, "the

undersigned placed appropriate consideration on the non-examining opinions of state

examiners as a reasonable analysis of the record at that time but finds that the weight of

the current record supports the finding herein."  (Id.)

 The ALJ stated that she did not place controlling weight on the opinions of

disability offered since the date last insured.  (Id.)  The ALJ noted that Plaintiff

complained of a multitude of problems since the late 1990s, and complained of

hypersomnolence since high school, but was still able to work competitively until 2002.

(Id.)  The ALJ stated that Plaintiff was able to manage her symptoms with aggressive

physical therapy, and there was no objective findings to explain the significant decline in

her condition.  (Id. at 24-25.)  The ALJ stated that despite medical recommendations that

Plaintiff remain as active as possible, Plaintiff spent much of her time in bed, if not

sleeping, watching television, reading, and using a laptop.  (Admin. R. at 25.)  The ALJ

also stated that Plaintiff's testimony was somewhat inconsistent because she reported

sleeping up to sixteen to twenty hours a day, but reported insomnia as a side effect of her

medications.  (Id.)

Pursuant to 20 C.F.R. § 404.1565, the ALJ concluded that Plaintiff could not

perform her past relevant work.  (Id.)  Based on the vocational expert's testimony in

response to a hypothetical question incorporating Plaintiff's residual functional capacity,

the ALJ concluded that Plaintiff could perform other work in the regional economy

including security monitor, production/optical assembly, and electrical assembly.  (Id. at

26.)  Thus, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act from October 15, 2002 through December 31, 2004.  (Id.)

## II.      STANDARD OF REVIEW

Congress has prescribed the standard by which disability benefits may be awarded.  "The Social Security Program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

### A.      ADMINISTRATIVE REVIEW

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  Id. at § 404.929.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic.  Id. at § 404.967-.982.  The decision of the Appeals Council, or of the ALJ if the request for

review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 1383(c)(3); 20 C.F.R. § 404.981.

B.    JUDICIAL REVIEW

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole. Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989.) Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding." Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980). Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir 1989) (citing Brand, 623 F.2d at 527.)

A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). If it is possible to reach two inconsistent positions from the evidence, and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.     DISCUSSION

Plaintiff contends the ALJ made several errors in her analysis. First, Plaintiff contends the ALJ failed to follow the Appeals Council's Remand Order by not addressing Social Security Ruling 99-2p regarding chronic fatigue syndrome. Second, Plaintiff contends that the ALJ erred by not including adrenal insufficiency as one of Plaintiff's severe impairments at the second step of the disability evaluation. Third, Plaintiff alleges multiple errors at the fourth step of the evaluation process including her failure to properly weigh the physicians' opinions, her failure to provide appropriate weight to Plaintiff's subjective complaints, and her failure to correctly assess Plaintiff's residual functional capacity. Fourth, Plaintiff alleges the ALJ erred in finding that she can perform work, because the ALJ relied on the vocational expert's testimony that was based on a faulty hypothetical question.

## A.    APPEALS COUNCIL'S REMAND ORDER

On remand, the Appeals Council ordered the ALJ to address Social Security Ruling 99-2p ("SSR"), which discusses how to evaluate cases involving chronic fatigue syndrome ("CFS").  (Admin. R. at 63.)   Plaintiff asserts that the ALJ failed to do so. Defendant contends that although the ALJ did not specifically cite SSR 99-2p, the ALJ followed the directives of SSR 99-2p in her evaluation.

Social Security Ruling 99-2p describes the CDC definition of chronic fatigue syndrome as follows:

> Under the CDC definition, the hallmark of CFS is the presence of clinically evaluated, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities.  Additionally, the current CDC definition of CFS requires the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have pre-dated the fatigue: self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities; sore throat; tender cervical or axillary lymph nodes; muscle pain; multi-joint pain without joint swelling or redness; headaches of a new type, pattern or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours.

SSR 99-2p, 1999 WL 271569, *1-2 (S.S.A.)  The ruling also states that "CFS has been diagnosed in children, particularly adolescents, as well as in adults."  Id. at *1.   An individual with CFS can have a wide range of other symptoms including sleep disturbances and depression.  Id. at *2.

In this case, the ALJ found that Plaintiff had a medically determinable impairment of chronic fatigue syndrome.  (Admin. R. at 17.)  SSR 99-2p provides that claims involving chronic fatigue syndrome are adjudicated under the same sequential evaluation process as any other impairment.  1999 WL 271569 at *4.  The ruling also instructs that conflicting evidence in the medical record is not unusual in cases of CFS due to the complicated diagnostic process involved.  Id. at *7.  The ruling states that clarification of conflicts in the evidence should be sought from the individual's treating physician or other medical source.  Id.

Plaintiff was evaluated and treated by a chronic fatigue specialist, Dr. Karen Vrchota, after her insured status expired, but the ALJ declined to consider Dr. Vrchota's opinion and did not discuss Dr. Vrchota's treatment records.  "Evidence of disability subsequent to the expiration of one's insured status can be relevant to elucidate a medical condition during the time for which benefits might be awarded."  Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998).

Shortly before Plaintiff's insurance period expired, Dr. Bateman recommended that Plaintiff see a chronic fatigue specialist because he could not find a physiological explanation for Plaintiff's chronic fatigue.  (Admin. R. at 325.)  Plaintiff had an extensive evaluation at the Mayo Clinic several months later, but Plaintiff did not see a chronic fatigue specialist until November 30, 2006.  (Id. at 642-45.)  After reviewing Plaintiff's extensive medical records, Dr. Vrchota opined that Plaintiff met the CDC criteria for CFS.  (Id. at 645.)  This is consistent with Dr. Rhame's diagnosis of CFS in 2003, before Plaintiff's insured status expired.  (Id. at 275.)

In a disability questionnaire, Dr. Vrchota listed a number of clinical and laboratory test results that were consistent with Plaintiff's diagnosis of CFS including blood pressure, heart rate, cold hands and feet, muscle weakness and decreased grip strength, and others. (Id. at 620.) Dr. Vrchota opined that Plaintiff was disabled previous to her first appointment with her, and suggested Plaintiff had been disabled since the summer of 2002. (Id. at 620.)

The ALJ failed to analyze this important evidence. In rejecting the treating physicians' opinions of Plaintiff's disability and Plaintiff's credibility based largely on the lack of objective medical evidence, the ALJ failed to take heed of SSR 99-2p's instruction that conflicting evidence in the medical record is not unusual in cases of CFS due to the complicated diagnostic process involved. Analysis of Dr. Vrchota's opinion and her records of Plaintiff's treatment could have aided the ALJ in resolving conflicting evidence in Plaintiff's favor; in other words, the reason there frequently were no objective findings for Plaintiff's symptoms was because they were caused by CFS. This clear error by the ALJ affected the accuracy of her residual functional capacity analysis, which the Court will address below.

### B.     ADRENAL INSUFFICIENCY AS A SEVERE IMPAIRMENT

Plaintiff alleges the ALJ erred at step two of the evaluation process by failing to include adrenal insufficiency as one of Plaintiff's severe impairments. Plaintiff argues that although she was diagnosed with adrenal insufficiency in 2005, the impairment was found to be caused by trigger point injections that Plaintiff began in 2003. Plaintiff contends the ALJ's error was prejudicial because the ALJ rejected Plaintiff's subjective

complaints of pain and fatigue because there was a lack of objective evidence, but the diagnosis of adrenal insufficiency provided objective evidence.

Defendant counters that once the ALJ finds any severe impairment at step two of the evaluation process, the ALJ must consider all impairments, severe and nonsevere, in determining the claimant's residual functional capacity. Thus, Defendant concludes any error was harmless. Defendant further notes that regardless of the cause of Plaintiff's fatigue, the ALJ considered it in her analysis of Plaintiff's RFC. Defendant also points out that Plaintiff had other impairments that caused fatigue which the ALJ credited.

The ALJ's failure to include adrenal insufficiency as a severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity. See Fisk v. Astrue, 253 F.App'x 580, 583 (6th Cir. 2007) ("when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error.'") (quoting Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987)). Furthermore, the record as a whole does not support Plaintiff's argument that her diagnosis of adrenal insufficiency provides objective evidence to explain her pain and fatigue.

Plaintiff's pain and fatigue predates, by many years, the trigger point injections that caused her adrenal insufficiency. (Admin. R. at 476-78.) Dr. Nippoldt opined only that adrenal insufficiency "could be contributing to at least some of her symptoms." (Id. at 496.) Plaintiff's pain and fatigue also occurred well after her adrenal insufficiency was resolved, although there was some question whether her adrenal insufficiency recurred.

(Id. at 483, 550, 552, 727.) Nonetheless, the ALJ should have acknowledged that adrenal insufficiency could have contributed to Plaintiff's symptoms, but it is unlikely that this would have affected the ALJ's decision and therefore is not reversible error.

**C.     RESIDUAL FUNCTIONAL CAPACITY EVALUATION**

Plaintiff alleges several errors at step four of the evaluation process. Plaintiff alleges the ALJ failed to give proper weight to her treating physicians' opinions, failed to explain why she rejected the non-examining medical opinions, failed to state which medical opinions she relied on in determining Plaintiff's RFC, failed to incorporate the mental health limitations caused by Plaintiff's pain and fatigue into the RFC, and failed to properly evaluate Plaintiff's subjective complaints.

In response, Defendant contends the ALJ considered the evidence of record and reasonably found that Plaintiff could perform a limited range of sedentary work prior to the expiration of her insured status. Defendant asserts the ALJ adequately addressed the medical source opinions and properly discounted opinions that did not pertain to the relevant time period and were inconsistent with other substantial evidence. Defendant also argues the ALJ considered the appropriate factors in concluding that Plaintiff's subjective complaints of disabling limitations were not credible.

**1.     Medical Opinions**

A physician's opinion is typically entitled to controlling weight if it is "well-supported" by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. Leckenby v. Astrue, 487 F.3df 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 110, 1012-1013 (8th Cir. 2000.)) "An ALJ may discount such an opinion if other medical assessments

are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician. Lehnartz v. Barnhart, 142 F.App'x 939, 942 (8th Cir. 2005).

If an ALJ determines not to grant controlling weight to a treating physician's opinion, medical opinions are further evaluated under the framework described in 20 C.F.R. § 404.1527(d). Under such framework, the ALJ should consider the following factors in according weight to medical opinions: (1) whether the source has examined the claimant; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the quantity of evidence in support of the opinion; (5) the consistency of the opinion with the record as a whole; and (6) whether the source is a specialist. Id.

The ALJ failed to address Dr. Will's January 2004 opinion that Plaintiff "could not realistically maintain any gainful employment." (Admin. R. at 113-14.) In support of his opinion, Dr. Will stated, "[s]he always did look very fatigued and worn out by this pain. I always did feel she had one of the most extreme cases of fibromyalgia that I have ever seen." (Id. at 114.) Plaintiff met the diagnostic criteria for fibromyalgia with eighteen of eighteen tender points in the relevant time frame. (Id. at 232, 236-38, 270, 477.)

Although the ALJ did not discuss Dr. Will's opinion, she must have rejected it because she noted that Plaintiff complained of a multitude of problems since the late 1990s but was still able to work competitively until 2002. (Id. at 24.) Plaintiff was

diagnosed with fibromyalgia in 1998. (Id. at 154-56.)  In 1998, Dr. Heiring noted that

despite her treatment of Plaintiff's pain, Plaintiff did not feel she could work full-time.

(Id. at 197.)  Plaintiff worked "varied hours" from 1996-2002.  (Id. at 138.)  The record

does not support the ALJ's statement that Plaintiff worked "competitively" until 2002.  It

appears that Plaintiff worked when she felt she could.

Plaintiff's medical records leading up to her alleged onset date of October 2002,

indicate that her pain and fatigue were not responding well to treatment.  (Id. at 197, 236-

38, 240-43, 476-78, 469-72.)  Plaintiff ultimately quit working entirely and moved back

in with her parents.  (Id. 152, 488.)  The ALJ should have considered these facts in

evaluating the record as a whole.  See Brosnahan v. Barnhart, 336 F.3d 671, 672 n. 1 (8th

Cir. 2003) (fibromyalgia is a chronic condition causing long-term but variable levels of

joint and muscle pain, stiffness, and fatigue.)

As the Court has already noted, the ALJ also erred by failing to consider whether

any of the physicians' opinions that were provided after Plaintiff's insured status expired

could elucidate any of the medical conditions Plaintiff suffered during the relevant time

period.  Dr. Vrchota's treatment records and her opinion that Plaintiff was disabled by

chronic fatigue syndrome help explain why there were previously "no objective findings"

to support Plaintiff's subjective complaints.  As stated in SSR 99-2p, CFS may be a

disabling impairment, and the diagnosis should only be made "after alternative medical

and psychiatric causes of chronic fatiguing illness have been excluded."  Thus, before

CFS is diagnosed, one would expect that clinical and laboratory findings would have

been negative for other conditions.  If the ALJ had evaluated the record consistent with

SSR 99-2p, she could not have rejected the treating physicians' opinions and Plaintiff's subjective complaints for lack of objective findings on examination.

There is much evidence in the record which is consistent with a diagnosis of chronic fatigue syndrome during the relevant time period. Plaintiff was tender, fatigued and suffered numerous other unexplainable symptoms. (Admin. R. at 152, 269, 275, 276, 325-26, 476.)[2] When Plaintiff saw Dr. Vrchota, a CFS specialist, Dr. Vrchota was able to recognize the consistency of Plaintiff's symptoms over time with a diagnosis of CFS, and to perform certain laboratory tests, the results of which were also consistent with a diagnosis of CFS. (Id. at 620-25, 645, 723.) See SSR 99-2p ("At this time [1999] there are no specific laboratory findings that are widely accepted as being associated with CFS. However, the absence of a definitive test does not preclude reliance upon certain laboratory findings. . . . With continuing scientific research, new medical evidence may emerge that will further clarify the nature of CFS and provide greater specificity regarding the clinical and diagnostic techniques that should be used to document this disorder.")

The ALJ also failed to consider Dr. Fox's opinion that Plaintiff was disabled, because the opinion was not provided until September 2006. (Admin. R. at 582.) The ALJ should also have considered whether Dr. Fox's opinion elucidated any of Plaintiff's medical impairments during the relevant time frame, because she would have found that it did.

---

[2] The Court notes that Plaintiff was also diagnosed with fibromyalgia during the relevant time frame, but the two conditions have many similar characteristics. See Brosnahan, 336 F.3d at 672 n.1(defining characteristics of fibromyalgia) and SSR 99-2p (defining characteristics of chronic fatigue syndrome).

Dr. Fox first saw Plaintiff in 2002, and a sleep study indicated Plaintiff had nonrestorative sleep, severe sleep fragmentation, and physiologic hypersomnolence. (Id.) In her opinion letter, Dr. Fox noted that a repeat sleep study in 2005 also documented extremely fragmented and poor sleep, and opined that this exacerbated Plaintiff's pain and affected her mental abilities when she was awake. (Id.) The ALJ's only analysis of the two sleep studies was that the length of time between the two studies suggested that Plaintiff did not suffer significant sleep problems in the interim. (Id. at 24.) This conclusion has no support in the record, especially since Plaintiff continued to seek new evaluations and treatment for her fatigue and nonrestorative sleep, including an extensive evaluation at the Mayo Clinic before she returned to Dr. Fox in 2005. (Id. at 465-66, 483-489.) The sleep studies provide objective evidence supporting Plaintiff's subjective complaints of fatigue and nonrestorative sleep, and, as noted by Dr. Fox, deficits in her mental functioning when she was awake.

The ALJ's analysis of the physicians' opinions was also deficient because, after declining to give controlling weight to certain physicians' opinions and ignoring others, the ALJ did not weigh the medical opinions in accordance with the framework described in 20 C.F.R. § 404.1527(d). The ALJ's only explanation for her partial reliance on the state agency physicians' opinions was "the undersigned placed appropriate consideration on the non-examining opinions of the state examiners as a reasonable analysis of the record at that time but finds that the weight of the current record supports the finding herein." (Admin. R. at 24.) This makes little sense in light of the fact that the ALJ declined to consider any treating physician's opinion that was provided after Plaintiff's

insurance status expired in December 2004.  For all of these reasons, the ALJ erred in rejecting the treating physicians' opinions.

### 2.    Credibility Analysis

Subjective complaints play a role in assessing a claimant's RFC.  Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005).  "In assessing a claimant's credibility, the ALJ must consider:  (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009).  The ALJ must explain her reasons for discrediting subjective complaints, but the ALJ need not explicitly discuss each factor.  Id.  "An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole."  Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).

For the reasons discussed above, the ALJ erred by finding the absence of objective medical findings to be a negative credibility factor.  First, Plaintiff was diagnosed with fibromyalgia during the relevant period and met the CDC criteria for the diagnosis.  Second, the ALJ failed to consider the complicated diagnostic process associated with chronic fatigue syndrome, with which Plaintiff was also diagnosed during the relevant period, and confirmed later by a specialist.  Third, the sleep studies in 2002 and 2005 confirmed Plaintiff's subjective complaints of hypersomnolence and nonrestorative sleep.   Finally, both Dr. Bateman (Admin. R. at 527) and Dr. Vrchota (Admin. R. at 621) specifically found that Plaintiff was not a malingerer.

Plaintiff's daily activities, spent mostly in bed, sometimes napping, reading, watching television, or using a laptop computer are consistent with her complaints of pain, fatigue and nonrestorative sleep. This factor supports Plaintiff's credibility. Furthermore, the ALJ has not cited any evidence that the duration, frequency, or intensity of Plaintiff's symptoms is a negative credibility factor, and the Court finds that the record supports the opposite conclusion with evidence that Plaintiff's pain, fatigue, and nonrestorative sleep were frequently severe.

Plaintiff regularly sought treatment and evaluation for pain, fatigue, and other symptoms. During the time period from October 2002 through December 2004, Plaintiff was prescribed Morphine, Zoloft, Methadone, Darvocet, Klonopin, and Nortriptyline in an effort to control her symptoms. After her sleep study in 2005, Xyrem was added to Plaintiff's potent medications. The ALJ failed to recognize that Plaintiff's consistent medical attention and treatment with strong prescription medications, trigger point injections, and physical therapy were positive credibility factors. See Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) (repeated and consistent doctor visits coupled with taking numerous prescription medications and use of many pain treatment modalities supported claimant's subjective complaints of pain). Instead, the ALJ noted that Plaintiff's claim that some of her medications caused insomnia was inconsistent with her allegation of excessive sleep. (Admin. R. at 25.) This minor inconsistency is insignificant in light of the substantial evidence that Plaintiff was treated extensively with little improvement of her complaints of pain and fatigue. Plaintiff honestly testified that all of her medications caused side effects, but it was difficult to say which symptoms were caused by her illness and which were side effects of her medications. (Id. at 826.)

In support of her decision, the ALJ stated that "many providers suggested that [Plaintiff's] emotional symptoms appeared to be exacerbating her pain and mental health evaluation and/or treatment was suggested. However, the claimant denied any true depression and did not seek formal treatment." (Id. at 24.) These statements are not consistent with the record as a whole.

It is true that Plaintiff did not believe her symptoms had a psychological cause and she did not seek counseling. (Id. at 578, 774.) However, she underwent psychological evaluations on several occasions and was treated for depression with medication. (Id. at 230, 326, 578-80, 775-76.) The mental health experts who evaluated Plaintiff determined that Plaintiff's physical symptoms caused her depression. (Id. at 444, 777.) These facts do not support the ALJ's conclusion that Plaintiff's subjective complaints were not credible. Overall, there is little support in the record for the ALJ's credibility analysis.

### D. VOCATIONAL EXPERT'S TESTIMONY

Defendant contends the ALJ properly incorporated Plaintiff's credible impairments into the RFC, and the ALJ was entitled to rely on the VE's testimony in response to a properly-phrased hypothetical question. However, where the ALJ's RFC analysis was in error, as in this case, it cannot be the basis for a proper hypothetical question to a vocational expert. Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998). Thus, the ALJ erred at the fifth step of the evaluation process.

## IV.     RECOMMENDATION

Typically remand for further development of the record is the proper remedy when the ALJ fails to properly analyze disability.  However, Plaintiff argues an award of benefits is appropriate because the evidence in the record overwhelmingly supports a finding of disability.  The Court agrees.  Four of Plaintiff's treating physicians, Dr. Will, Dr. Bateman, Dr. Fox and Dr. Vrchota, opined that Plaintiff was disabled during the relevant time frame, and one of those opinions was provided before Plaintiff's insurance status expired.  (Admin. R. at 113-14, 526-31, 582, 620-25.)  Furthermore, the evidence as a whole strongly favors the credibility of Plaintiff's subjective complaints.  Finally, when a hypothetical question which included all of Plaintiff's limitations, as described by Dr. Bateman, was posed to the vocational expert, the VE testified that such a person could not perform any work.  (Id. at 840.)  Therefore, the Court recommends that the ALJ's decision be reversed and the case be remanded for an award of benefits.

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 13] be **GRANTED** and the decision of the Commissioner be reversed;

2.      Defendant's Motion for Summary Judgment [Docket No. 16] be **DENIED**;

3.      The case be **REMANDED** to the Commissioner for an immediate award of benefits.

Dated:      February 5, 2010                               _s/ Susan Richard Nelson_____
                                                            SUSAN RICHARD NELSON
                                                            United States Magistrate Judge

Under D.Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 22, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.